UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| | | | |
|---|---|---|---|
| Case No. | EDCV 24-1915 JGB (SPx) | Date | July 23, 2025 |
| Title | *Larell Epps v. National Distribution Centers, LLC, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) GRANTING Plaintiff's Motion to Remand (Dkt. No. 27); (2) DENYING-AS-MOOT Defendant's Motion to Compel Arbitration, Strike Class Claims, and Stay Proceedings (Dkt. No. 26); (3) VACATING the July 28, 2025 Hearing; and (4) DIRECTING the Clerk to Close the Case (IN CHAMBERS)

Before the Court are two motions—a motion to remand filed by Plaintiff Larell Epps ("Epps" or "Plaintiff") ("MTR," Dkt. No. 27) and a motion to compel arbitration, strike class claims, and stay proceedings filed by Defendant National Distribution Centers, LLC ("NDC" or "Defendant") ("MTC," Dkt. No. 26) (collectively, "Motions"). The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court **GRANTS** the MTR and **DENIES-AS-MOOT** the MTC. The Court **VACATES** the hearing set for July 28, 2025.

### I. BACKGROUND

On July 18, 2024, Epps, individually and on behalf of similarly situated individuals, filed a putative class action complaint in the Superior Court of the County of San Bernardino against NDC and Does 1 through 100. ("Complaint," Dkt. No. 1-2.) On September 5, 2024, NDC answered the Complaint. ("Answer," Dkt. No. 1-3.) On September 6, 2024, Defendant removed the action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), and 28 U.S.C. §§ 1441 and 1446. ("NOR," Dkt. No. 1.) In support of its NOR, NDC filed the following documents: (1) declaration of attorney Allison S. Wallin ("Wallin NOR Decl.," Dkt. No. 1-1); (2) declaration of Michelle Montesano, HRIS Analyst for NFI

Management Services, LLC ("NFI") ("Montesano NOR Decl.," Dkt. No. 1-4); and (3) declaration of Sarah Pontoski, Vice President and Assistant General Counsel for NFI ("Pontoski NOR Decl.," Dkt. No. 1-5).

The Complaint alleges five causes of action against NDC under the California Labor Code and California Business and Professions Code: (1) failure to provide meal periods, Cal. Lab. Code §§ 226 and 512; (2) failure to provide rest periods, Cal. Lab. Code § 226; (3) failure to provide accurate itemized wage statements, Cal. Lab. Code § 226; (4) failure to timely pay final wages at termination, Cal. Lab. Code §§ 201-203; and (5) unfair business practices, Cal. Bus. & Prof. Code §§ 17200, et seq. (hereinafter referred to as "UCL"). (See Complaint.)

On March 28, 2025, Plaintiff filed the Motion to Remand. (MTR.) In support of the MTR, Plaintiff filed a declaration of attorney J. Jason Hill. ("Hill MTR Decl.," Dkt. No. 27-2.) On April 7, 2025, NDC opposed the MTR. ("MTR Opposition," Dkt. No. 32.) Plaintiff replied on April 14, 2025. ("MTR Reply," Dkt. No. 36.)

On March 21, 2025, Defendant filed the Motion to Compel Arbitration. (MTC.) In support of its MTC, NDC filed the following documents:

- Declaration of attorney Allison S. Wallin ("Wallin MTC Decl.," Dkt. No. 26-2) alongside two exhibits ("Wallin, Exhibit A-B," Dkt. No. 26-2 at 4-62);
- Declaration of Michelle Montesano ("Montesano MTC Decl.," Dkt. No. 26-3) alongside two exhibits ("Montesano, Exhibit A-B," Dkt. No. 26-3 at 8-27); and
- Declaration of Sarah Pontoski ("Pontoski MTC Decl.," Dkt. No. 26-4).

On April 3, 2025, Plaintiff opposed the MTC.[1] ("MTC Opposition," Dkt. No. 28). In support of the MTC Opposition, Plaintiff filed the following documents:

- Declaration of attorney J. Jason Hill ("Hill MTC Decl.," Dkt. No. 28-1);
- Declaration of attorney Brett Szmanda ("Szmanda MTC Decl.," Dkt. No. 28-2) alongside two exhibits ("Szmanda, Exhibit 1-2," Dkt. No. 28-2 at 3-10); and

---

[1] Pursuant to this Court's Local Rules, Plaintiff should have filed an opposition or a notice of non-opposition to the MTC on or before March 31, 2025. See L.R. 7-9 ("Each opposing party shall, . . . not later than twenty-one (21) days before the date designated for the hearing of the motion . . . , serve upon all other parties and file with the Clerk either (a) the evidence upon which the opposing party will rely in opposition to the motion and a brief but complete memorandum which shall contain a statement of all the reasons in opposition thereto and the points and authorities upon which the opposing party will rely, or (b) a written statement that that party will not oppose the motion."). Plaintiff's Counsel explains that the MTC Opposition was filed late, per this Court's Local Rules, due to a calendaring error. (See Hill MTC Decl. ¶¶ 4-6.) The Court admonishes Plaintiff and warns that "the failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the (continued . . . )

- Declaration of Plaintiff Epps ("Epps MTC Decl.," Dkt. No. 28-3).

On April 7, 2025, Defendant replied. ("MTC Reply," Dkt. No. 33.) On June 17, 2025, Plaintiff submitted a request for judicial notice in support of his MTC Opposition.² ("RJN," Dkt. No. 49.)

## II.     FACTUAL ALLEGATIONS

Plaintiff worked as an hourly non-exempt employee of Defendant from approximately August 2023 through on or about May 24, 2024. (Complaint ¶¶ 4-5.) Plaintiff brings this action on behalf of himself and all other current, former, and/or future hourly-paid, non-exempt, direct and temporary, California employees of Defendant. (Id. ¶ 3.) The proposed class is defined as the "California Class" which is made up of the following sub-classes:

> **Meal Period Class:** All current and former hourly non-exempt employees . . . in California at any time from four [] years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who worked shifts more than five [] hours yet Defendant[] failed to authorize or permit all required duty-free meal periods of not less than thirty [] minutes.

> **Meal Period Premium Wages Class:** All current and former hourly non-exempt employees . . . in California at any time from four [] years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who received additional remuneration during pay periods in which they were paid meal period premium wages and whose regular rate of pay did not include such additional remuneration when Defendant[] calculated those employees' meal period premium wages.

//
//
//

---

motion . . . ." L.R. 7-12. However, because Defendant was not overly prejudiced by Plaintiff's failure to comply with this Court's Local Rules—as evidenced by its timely filed MTC Reply—the Court will not "disregard" the MTC Opposition and "issue sanctions" as requested by Defendant. (See MTC Reply at 7-8.)

² A minute order filed in a related state court proceeding is the subject of Plaintiff's RJN. (See RJN.) Courts may take judicial notice of undisputed matters of public record, including documents on file in courts. See Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012); United States v. Black, 482 F.3d 1035, 1041 (9th Cir. 2007). Accordingly, the Court **GRANTS** Plaintiff's RJN.

>**Rest Period Class:** All current and former hourly non-exempt employees . . . in California at any time from four [] years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who worked shifts of at least three-and-a-half [] hours who did not receive all required duty-free rest periods of a net ten [] minutes for every four [] hours worked or major fraction thereof.
>
>**Rest Period Premium Wages Class:** All current and former hourly nonexempt employees . . . in California at any time from four [] years prior to the filing of the initial Complaint in this matter through the date notice is mailed to a certified class who received additional remuneration during pay periods in which they were paid rest period premium wages and whose regular rate of pay did not include such additional remuneration when Defendant[] calculated those employees' rest period premium wages.
>
>**Wage Statement Class:** All current and former hourly non-exempt employees . . . in California at any time from one [] year prior to the filing of the initial Complaint in this action through the date notice is mailed to a certified class who received inaccurate or incomplete wage and hour statements.
>
>**Waiting Time Class:** All current and former hourly non-exempt employees . . . in California at anytime from three [] years prior to the filing of the initial Complaint in this action through the date notice is mailed to a certified class who did not receive payment of all unpaid wages upon separation of employment within the statutory time period.

(Id. ¶ 29.)

The Complaint alleges that Defendant failed to (1) authorize or permit legally compliant meal periods and/or pay meal period premium wages; (2) authorize and permit rest periods and/or pay rest period premiums; (3) furnish accurate wage statements; and (4) timely pay final wages. (Id. ¶¶ 12-28, 31-68.) Plaintiff also alleges that Defendant's unlawful conduct constitutes unfair competition. (Id. ¶¶ 69-72.)

//
//
//
//
//
//

## III. LEGAL STANDARD

### A. Remand

"CAFA gives federal district courts original jurisdiction over class actions in which the class members number at least 100, at least one plaintiff is diverse in citizenship from any defendant, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs." Ibarra v. Manheim Investments, Inc., 775 F.3d 1193, 1195 (9th Cir. 2015). "In determining the amount in controversy, courts first look to the complaint. Generally, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." Id. at 1197 (quotations omitted). "Whether damages are unstated in a complaint, or, in the defendant's view are understated, the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." Id.

Where a plaintiff makes a factual attack in the context of CAFA jurisdictional requirements, defendants are required to support their jurisdictional allegations with proof typically considered at summary judgment. A factual attack "contests the truth of the . . . allegations" themselves. Id. (citation omitted). "When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million jurisdictional threshold." Id. (quoting Ibarra, 775 F.3d at 1197). A factual attack "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." Harris v. KM Indus., Inc., 980 F.3d 694, 700 (9th Cir. 2020) (citing Ibarra, 775 F.3 at 1199 (finding that it is sufficient to "contest[ an] assumption" without "assert[ing] an alternative [assumption] grounded in real evidence")).

A defendant is required to file a notice of removal that includes only "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." Dart Cherokee Basin Operating Co. v. Owens, 574 U.S. 81, 88 (2014). However, if a plaintiff contests these allegations, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." Id. The preponderance of the evidence standard requires that "the defendant must provide evidence establishing that it is more likely than not that the amount in controversy exceeds that amount." Sanchez v. Monumental Life. Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996) (internal quotations omitted). The parties "may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of the removal." Ibarra, 775 F.3d at 1197 (internal quotations and citation omitted). "[A] defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions." Id.

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." Id. at 1198. "As with other important areas of our law, evidence may be

direct or circumstantial. In either event, a damages assessment may require a chain of reasoning that includes assumptions. When that is so, those assumptions cannot be pulled from thin air but need some reasonable ground underlying them." Id. at 1199. "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." Id.

### B. Arbitration

The Federal Arbitration Act ("FAA") provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes a general policy favoring arbitration agreements. AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011); Cox v. Ocean View Hotel Corp., 533 F.3d 1114, 1119 (9th Cir. 2008) ("Section 2 of the FAA creates a policy favoring enforcement of agreements to arbitrate."). Its principal purpose is to "ensure that private arbitration agreements are enforced according to their terms." Concepcion, 563 U.S. at 334 (citing Volt Info. Sciences, Inc. v. Bd. of Tr. of Leland Stanford Jr. Univ., 489 U.S. 468 (1989) (internal quotation marks omitted)). "Arbitration is a matter of contract, and the [FAA] requires courts to honor parties' expectations." Id. at 351.

Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such an arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. Id. If such a showing is made, the district court shall also stay the proceedings pending resolution of the arbitration at the request of one of the parties bound to arbitrate. Id. § 3. On a motion to compel arbitration, a district court's involvement is limited to "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." Cox, 533 F.3d at 1119 (quoting Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000)). A party seeking to compel arbitration under the FAA bears the burden of making this showing. Id.

## IV. DISCUSSION

### A. Motion to Remand

Plaintiff moves to remand on the grounds that Defendant failed to prove by a preponderance of the evidence that the amount in controversy ("AIC") for the putative class exceeds the $5,000,000 CAFA jurisdictional minimum. (See MTR at 4-8.)

#### 1. Amount in Controversy

In its NOR, Defendant asserts that the AIC requirement under CAFA is independently satisfied by the Complaint's waiting time penalties and claims related to unpaid premiums, which

totals to an aggregate AIC of $7,845,258.24 excluding attorneys' fees.  (See NOR at 6-9.)  Because the Complaint does not state the amount of damages sought, Defendant must prove that the AIC exceeds $5 million.  See Ibarra, 775 F.3d at 1197.  "[T]he Court must decide, based upon evidence submitted, whether the amount in controversy requirement has been satisfied by a preponderance of the evidence."  Torrez v. Freedom Mortg., Corp., 2017 WL 2713400, at *3 (C.D. Cal. June 22, 2017).  "[A] defendant may establish the amount in controversy by relying on admissible statistical evidence taken from a representative sample and extrapolated to calculate the potential liability for the full class."  Duberry v. J. Crew Grp., Inc., 2015 WL 4575018, at *2 (C.D. Cal. July 28, 2015) (citing LaCross v. Knight Transp. Inc., 775 F.3d 1200, 1202–09 (9th Cir. 2015)).  However, a defendant is "not required to comb through the records to identify and calculate the exact frequency of violations."  Salcido v. Evolution Fresh, Inc., 2016 WL 79381, at *6 (C.D. Cal. Jan. 6, 2016).  "Defendant has no obligation . . . to support removal with production of extensive business records to prove or disprove liability and/or damages with respect to plaintiff or the putative class members at this premature (pre-certification) stage of the litigation."  Ray v. Wells Fargo Bank, N.A., 2011 WL 1790123, at *6 (C.D. Cal. May 9, 2011).  Where "a defendant must prove the amount in controversy by a preponderance of the evidence, a declaration or affidavit may satisfy the burden."  Id.

In calculating the AIC for the purposes of the NOR, Defendant relies on the Montesano NOR Declaration.  (See NOR.)  Montesano declares that she reviewed NDC's employment data, and based on that review, there are "4,539 non-exempt employees in California who have separated employment from NDC" between July 18, 2020 to present day (hereafter, the "Terminated Class").  (See Montesano NOR Decl. ¶¶ 2, 4.)  Montesano further declares that the putative class (1) were paid an average hourly rate of at least $19.20; (2) worked at least 476,838 workweeks; and (3) worked an average 8 hours per shift.  (Id. ¶¶ 5-6, 8.)

Based on Plaintiff's allegations of failure to pay meal and rest period premiums, if even a conservative estimate of 20% of employees in the Terminated Class were not paid all wages due upon termination, Defendant estimates that the waiting time penalties amount to at least $4,183,142.40.[3]  (See NOR at 8.)  Further, assuming one meal and one rest period violation per 20% of the total weeks worked by the putative class, Defendant estimates that the premiums owed would amount to at least $3,662,115.84.[4]  (Id.)

Here, Epps "make[s] a factual attack on [NDC's] estimates of the amount in controversy by contesting its evidence and reasoning, and without introducing extrinsic evidence of [his] own."  See Anderson v. Starbucks Corp., 556 F. Supp. 3d 1132, 1136 (N.D. Cal. 2020); see also Harris, 980 F.3d at 700 (when a plaintiff makes a factual attack they may submit evidence, but is not required to proffer "an alternative [assumption] grounded in real evidence" and may rely instead on "a reasoned argument as to why any assumptions on which [defendant's numbers] are

---

[3] 907.8 employees (20% of 4,539 separated employees) x $19.20 x 8 hours per shift x 30 days = $4,183,142.40.

[4] 95,367.6 workweeks (476,838 workweeks x 20%) x $19.20 hourly rate x 2 = $3,662,115.84 for meal period premiums and rest period premiums.

based are not supported by evidence") (citing and quoting Ibarra, 775 F.3d at 1199). For instance, Plaintiff contends that Defendant's "valuation . . . is not evidentiary and is not [] supported by a Declaration." (See MTR at 7.) Plaintiff further asserts the NOR "relies on faulty and improper calculations of Defendant's alleged violation rates." (See id.) The Court addresses these arguments in turn.

### a. Evidentiary Support

Plaintiff argues that Defendant provided "no supporting evidence . . . that could justify the use of any violation rate, even though Defendant is in a unique and exclusive position to establish a foundation." (Id.) The Court disagrees because NDC offers sufficient evidence via the Montesano NOR Declaration.

Montesano declares that she is a HRIS Analyst for NFI and is "familiar with UltiPro, NDC's system of record for employee data." (See Montesano NOR Decl. ¶ 2.) Montesano further asserts that within the course and scope of her duties, she reviewed NDC's employment data and records kept in the ordinary course of business pertaining to the putative class defined in the Complaint. (See id.) Based on that review, she determined how many non-exempt employees were terminated in California during the relevant time as well as these employees' average hourly rate, and hours and weeks worked. (See id. ¶¶ 4-6, 8-9.) Moreover, Pontoski declares that as the Vice President and Assistant General Counsel for NFI, she is familiar with the corporate structure and relationship between NDC and NFI. (See Pontoski Decl. ¶ 1.) Specifically, NDC is wholly owned by NFI. (See id. ¶ 5.)

Accordingly, the Montesano NOR Declaration is competent evidence because it does not reveal any "statement, other than one made by the declarant . . ., offered in evidence to prove the truth of the matter asserted." Deleon v. Time Warner Cable LLC, 2010 WL 11515279, at *2 (C.D. Cal. Apr. 12, 2010) (internal citations omitted). The Montesano NOR Declaration relies on Montesano's personal knowledge learned from her position and her review of employee rosters and payroll records. See Torrez v. Freedom Mortg., Corp., 2017 WL 2713400, at *3 (C.D. Cal. June 22, 2017) (finding that a declaration provided an adequate foundation because the declarant specified his position in the company and stated that he has access to certain employee-related information, which he accesses through his regular course of business activities). Further, any doubts associated with the Montesano NOR Declaration related to foundation, personal knowledge, and authentication is addressed by the Pontoski NOR Declaration. (See Pontoski NOR Decl.; Montesano NOR Decl.)

Nonetheless, the Court finds that NDC fails to meet its burden of establishing by a preponderance of the evidence that CAFA's AIC requirement is met because its calculations rely on unreasonable assumptions.

//
//
//

### b. Waiting Time Penalties

NDC estimates that the waiting time penalties associated with 20% of the Terminated Class during the relevant time adds $4,183,142.40 to the AIC. (See NOR at 8; MTR Opposition at 12.) However, Defendant's calculation for this claim uses the total number of terminated employees for the entire class period—i.e., July 18, 2020 to present day—whereas the statute of limitations for waiting time penalties is only three years. (See Montesano Decl. ¶ 4 ("Based on my review of NDC's records . . ., I determined that NDC has employed at least 4,539 non-exempt employees in California who have separated employment from ***NDC between July 18, 2020 to the present***.") (emphasis added)); see also Pineda v. Bank of Am., N.A., 50 Cal. 4th 1389, 1395 (2010) ("Actions for final wages not paid as required by sections 201 and 202 are governed by Code of Civil Procedure section 338, subdivision (a), which provides that a three-year statute of limitations applies to '[a]n action upon a liability created by statute, other than a penalty or forfeiture.'").

Consequently, the Court cannot rely on the Montesano NOR Declaration to determine the estimated AIC for this claim because the Terminated Class includes former employees whose waiting time penalties are barred by the statute of limitations pursuant to California Labor Code § 203. (See MTR Opposition at 12; MTR at 8); see also Lopez v. Advanced Drainage Sys., Inc., 2025 WL 1088199, at *5 (N.D. Cal. Apr. 11, 2025) (finding a defendant's waiting time penalties' calculation unreasonable because the "calculation used the total number of terminated employees for the entire class period, which consists of the four years prior to the filing of the complaint," when the statute of limitations is only three years). Even if "Defendant took a conservative estimate of assuming that only 20% of employees were not paid wages due upon termination," this miscalculation inflates the estimated AIC for this claim and is one the Court cannot accurately correct without "assuming that the putative class members terminated over the four-year class period were equally distributed across those four years." (See MTR Opposition at 12; MTR at 8); Lopez, 2025 WL 1088199, at *5; cf Roth v. Comerica Bank, 799 F. Supp. 2d 1107, 1118 (C.D. Cal. 2010) (finding AIC estimates reasonable when "defendants[, in part,] calculated possible waiting time penalties for the [] putative class members who left their employ in the past three years, effectively applying the three-year limitations period for actions upon a liability created by statute . . ."). The actual number of putative class members terminated in the three years prior to the filing of the Complaint is information easily and reliably determined from NDC's own records, rendering its reliance on entirely unsupported assumptions unreasonable.

### c. Unpaid Premiums

The Court need not decide the AIC for Plaintiff's remaining claims at issue—unpaid premiums—because even if the Court found that NDC met its burden to demonstrate by a preponderance of the evidence that its calculations for unpaid premiums are reasonable, the AIC would total less than $5,000,000, which does not meet CAFA's jurisdictional threshold. Regardless, the Court finds that NDC also relies on unreasonable assumptions when calculating the estimated AIC for unpaid premiums.

NDC estimates that meal and rest period premiums total to at least $3,662,115.84. (See NOR at 8; MTR Opposition at 12.) Based on the Complaint's allegation that NDC "*sometimes* employed policies, practices, and/or procedures that *sometimes* resulted in their failure to authorize or permit meal [and/or rest] periods to Plaintiff and similarly situated employees," NDC assumes one meal and one rest period violation per putative class member per week. (See Complaint ¶¶ 15, 18, 21, 24; NOR.) It then calculates the AIC on these claims by multiplying the average wage during the relevant time by 20% of the total number of weeks worked by the putative class. (See NOR at 7-10; MTR Opposition at 10-12.)

Defendant contends that the one meal and one rest period violation rate is a "modest" assumption. (See MTR Opposition at 12.) Defendant also cites to cases in which courts have found the same assumed violation rates reasonable where plaintiffs allege a "pattern and practice" or "regular or consistent practice" of meal and rest period violations. (See id. at 10 (citing Feao v. UFP Riverside, LLC, 2017 WL 2836207, at *5 (C.D. Cal. June 29, 2017) (assumption of 60% violation rate for meal and rest period claims was "sufficiently supported" where allegations in complaint could support 100% violation rate); Cavada v. Inter-Continental Hotels Group., Inc., 2019 WL 5677846 *7 (S.D. Cal. Nov. 1, 2019) (assumed violation rates as high as 60% are reasonable based upon "pattern and practice" allegations)).)

The Court finds that NDC's assumptions "lack factual support." Salazar v. Johnson & Johnson Consumer Inc., 2018 WL 4560683, at *3 (C.D. Cal. Sept. 19, 2018). "It would be just as consistent with the [Complaint] to assume a frequency of . . . once-per-quarter" violation based on the Complaint's allegations of "sporadic and intermitted practices." Duran v. Allegis Glob. Sols., Inc., 2021 WL 3281073, at *3 (N.D. Cal. Aug. 2, 2021); see also Ibarra, 775 F.3d at 1199 ("As with other important areas of our law, evidence may be direct or circumstantial. In either event, a damages assessment may require a chain of reasoning that includes assumptions. When that is so, those assumptions cannot be pulled from thin air but need some reasonable ground underlying them."). Notably, nothing in the Montesano NOR Declaration "purports to provide evidence that would assist the Court in making a reasonable assumption as to the applicable violation rate." Gonzalez v. H&M Hennes & Mauritz L.P., 2022 WL 179292, at *3 (C.D. Cal. Jan. 20, 2022). Thus, Defendant does "not provide any extrinsic evidence to tip the analysis in its direction, or point to anything in the [Complaint] that might do so." Duran, 2021 WL 3281073, at *3.

Moreover, the Court disagrees that the Complaint "*clearly* allege[s] a common policy and practice of failure to pay all wages earned at the time of separation as to all formerly employed putative class members." (See MTR Opposition at 11 (emphasis added).) Unlike the cases Defendant relies on which involve complaints that allege more facts to support a "pattern and practice" of California Labor Code violations, the facts in the Complaint associated with unpaid premiums include limiting language that renders Defendant's assumed violation rate unreasonable. (See, e.g., Complaint ¶¶ 15, 18, 21, 24; MTR at 5; MTR Opposition at 11); see also Smith v. Angelica Corp., 2021 WL 4987951, at *2 (N.D. Cal. Oct. 27, 2021) ("Plaintiff's complaint does not expressly allege or infer that every class member would qualify for every subclass or would qualify for every claim within a subclass."); cf. Garza v. Brinderson

Constructors, Inc., 178 F. Supp. 3d 906, 911-12 (N.D. Cal. 2016) (finding a defendant's "assumption that each putative class member missed one meal break and one rest period per workweek [was] reasonable" because the plaintiff alleged "that he 'regularly' missed meal breaks and that defendants maintained a 'policy or practice' of both meal and rest break violations").

"[NDC] does not set forth any facts supporting its assumptions regarding the frequency of meal and rest period violations . . . [therefore,] the Court finds that [NDC] has failed to establish by the preponderance of the evidence the amount in controversy for these claims." Salazar, 2018 WL 4560683, at *3 (finding that defendant presented no facts supporting its violation rate and thus defendant did not establish by a preponderance of the evidence the AIC for plaintiffs' meal and rest period claims); see also Garibay v. Archstone Communities LLC, 539 F. App'x 763, 764 (9th Cir. 2013) (affirming district court's decision that defendant's evidence was insufficient to support removal jurisdiction because defendant failed to provide any evidence regarding why the assumption that each employee missed two rest periods per week was more appropriate than one missed rest period per paycheck or month). Accordingly, because NDC failed to prove by a preponderance of the evidence that the estimated AIC for the putative class exceeds the $5,000,000 CAFA jurisdictional minimum, the Court **GRANTS** the MTR.

**B. Motion to Compel Arbitration**

Because the Court remands this action to the Superior Court of the County of San Bernardino, the Court lacks jurisdiction to rule on the MTC. Accordingly, the MTC is **DENIED-AS-MOOT**.

## V.  CONCLUSION

For the reasons above, the Court **GRANTS** the MTR and **DENIES-AS-MOOT** the MTC. The July 28, 2025 hearing is **VACATED** and the parties' requests to appear remotely at the hearing (Dkt. Nos. 34-35, 38) are **DENIED-AS-MOOT**. The case is **REMANDED** to the Superior Court of California for the County of San Bernardino and the Clerk of the Court is **DIRECTED** to close the case.

**IT IS SO ORDERED.**